Judgment rendered May 25, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,471-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MARGARET TURNER, ET AL                    Appellees

versus

CAJUN OPERATING COMPANY
(OF DELAWARE) D/B/A CHURCH'S
CHICKEN, ET AL                            Appellants

* * * * *

Appealed from the
Monroe City Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2018CV02246

Honorable Tammy Lee, Judge

* * * * *

| | |
|---|---|
| WANEK KIRSCH DAVIES LLC<br>By: Peter J. Wanek<br>    Lindsey G. Faulkner<br>    Kathryn Theriot Trew | Counsel for Appellants,<br>Cajun Operating<br>Company (Of Delaware)<br>D/B/A Church's Chicken |
| ANTHONY J. BRUSCATO | Counsel for Appellees,<br>Margaret Turner,<br>Dewayne McKinley,<br>Sheriff Turner, Sherron<br>Turner, Shedanja Pratt,<br>and Jacob Pratt |

* * * * *

Before COX, STEPHENS, and MARCOTTE, JJ.

**COX, J.**

This civil appeal arises from Monroe City Court, Ouachita Parish, Louisiana. Cajun Operating Company (of Delaware), d/b/a Church's Chicken ("Appellant"), appeals the trial court's judgment in favor of plaintiffs Margaret Turner, DeWayne McKinley, Sheriff Turner, Sherron Turner, and Shedanja Pratt, on behalf of her minor son, Jacob Pratt (collectively, the "Appellees"), who alleged that they contracted food poisoning from consuming undercooked chicken from the Appellant's restaurant. Because we find that the Appellees failed to present sufficient evidence establishing that their symptoms were caused by eating food from the Appellant's restaurant, we reverse the trial court's judgment.

## FACTS

On June 28, 2018, Appellees filed suit against the Appellant alleging that after they ate a portion of the meal Margaret Turner purchased from the Appellant's restaurant on 1690 DeSiard Street, Monroe, Louisiana, they each suffered from symptoms associated with food poisoning, namely, abdominal pain, nausea, vomiting, and diarrhea. In brief, Appellees argued that it was more probable than not that they suffered food poisoning from the Appellant's food. Trial commenced on October 15, 2020, in which the following testimony was heard:

First, Margaret Turner testified that on June 28, 2017, she invited her boyfriend, DeWayne McKinley, her brother and sister-in-law, Sheriff and Sherron Turner, and her minor nephew, Jacob Pratt, to her home. She stated that around eight or nine, when the restaurant was about to close, she purchased two boxes of chicken through the drive through, with eight pieces of chicken in each box. Margaret testified that after her initial inspection of

the chicken, it seemed fine.  Particularly, Margaret stated that after her first bite, the food seemed fine and cooked properly; however, upon her second bite, Margaret testified that she noticed that the food was undercooked, raw, and bloody and immediately spat out the food.  She then stated that the rest of the Appellees also noticed that the food was undercooked and stopped eating.  Because the restaurant was closed, Appellees decided to put the remaining food back into the boxes to return to the restaurant the next morning.

Margaret testified that the Appellees slept at her home that evening and that a few hours after they ate, they each began to feel ill.  Specifically, Margaret testified that she and the other Appellees were nauseated, and suffered from abdominal pain, diarrhea, and vomiting.  Margaret stated that she attempted to return the food to the Appellant's restaurant the following morning, but was informed that the restaurant could not take the food back.  That same day, she and the other Appellees presented to the emergency room at University Conway in Monroe, where they were diagnosed with food poisoning.  Although she ate cereal the morning she consumed the chicken, Margaret stated that because the meal from the Appellant's restaurant was the only food that she and the other Appellees had in common, she assumed that the chicken was the cause of their symptoms.

Next, DeWayne McKinley confirmed that the only meal each of the Appellees had together was the chicken at Margaret's home.  He testified that after he took an initial bite of the food, he noticed that it was "bloody and pink like."  He stated that he tried two different pieces of chicken, and the third piece was pink and undercooked.  He stated that the other Appellees also noticed that their food was undercooked, and they all stopped

2

eating the food the moment they noticed that it was raw. He stated that a few hours after eating the food, he began to feel sick and he went to the emergency room where he was given a pill and told to drink plenty of liquids and that the symptoms would have to "wear off." McKinley testified that it was possible that he ate chicken or poultry during that week, but could not be certain of the exact meals he consumed.

Diane Liddell ("Liddell"), a market leader for the Appellant's restaurant, testified. Liddell stated that she supervises nine of the Appellant's chain restaurants throughout Louisiana and Mississippi. Liddle testified that in this position, she visits each restaurant approximately once a month and that her last visit to the restaurant on DeSiard Street would have been during the beginning of June. Although she was not present at the restaurant during the incident, Liddell testified that she spoke with the restaurant's manager, Michael Dorsey, who informed her about the complaint.

Liddell stated that after the written report was transmitted, she referred the complaint to the Appellant's insurance adjuster for investigation; however, she did not know what the investigation revealed because the restaurant does not have a copy of the incident report and the only copy of the report was transmitted to the insurance adjuster. She further stated that it was also the restaurant's policy not to accept food customers attempt to return. If there are accusations of food poisoning, the restaurant does not generally test the food to determine if it is contaminated.

3

Liddell then testified that the restaurant's usual practice in preparing and cooking food was to have at least two cooks on duty,[1] who must be at least 18 years old. She stated that because improperly cooked chicken can transmit a type of bacteria that can cause food poisoning, the restaurant trains its employees to follow a strict regime in which to properly and safely cook the chicken to prevent sickness. Specifically, all chicken must be cooked in oil at a temperature of 340 degrees, cooking white meat for 12.5 minutes and dark meat for 15 minutes. Employees are then required to check the internal temperature of the food, ensuring that the internal temperature for each piece is 185 degrees; if the internal temperature has not been reached, then employees are to resubmerge the food for an additional 5 to 10 minutes. Liddell conceded that if not properly done, there is a possibility that a customer could receive undercooked chicken.

Liddell then testified that the restaurant typically cooks approximately 32 pieces of chicken at a time so that each batch would be cooked the same way; however, an error that affects one batch will not necessarily impact another batch. Liddell testified that on June 28, 2017, the restaurant sold approximately 4,800 pieces of chicken and that the only complaint she received about undercooked chicken came from the Appellees.

Next, Sheriff Turner testified, and confirmed that he, like the other Appellees, consumed the chicken at Margaret's home. Sheriff testified that while he was eating, he noticed that the food "tasted funny," and when he looked at the food, noticed that it was raw and bloody. He testified that because his stomach was upset and he felt nauseated a few hours after he ate

---

[1] Liddell testified that she did not know who the cooks were on the evening Margaret purchased the chicken or their level of training.

the chicken, he went to the emergency room where he was given a pill and was told to drink plenty of liquids. Sheriff also testified that he is disabled because he has a bad heart and is an active Hepatitis C patient. He acknowledged that symptoms of Hepatitis C often include "abdominal pain, nausea, diarrhea, fever, and accumulation of fluid in the abdominal cavity." He also stated that he did not eat anything prior to the chicken because his stomach was "messed up the day before," but that during the week, he may have eaten fish or poultry.

Likewise, Sherron Turner, Sherriff's wife, testified that when she ate the chicken, she noticed that it was bloody and raw. She stated that after eating the food, she felt nauseated and experienced vomiting and diarrhea. Sherron stated that like the other Appellees, she went to the emergency room where she was diagnosed with food poisoning, was given a pill, and told to drink plenty of liquids. On cross-examination, Sherron testified that the only meal she ate on June 28, 2017, was the chicken Margaret purchased from the Appellant's restaurant. Sherron also confirmed that because she is diabetic, she has gone to the emergency room prior to this incident complaining of abdominal pain, nausea, and vomiting. She acknowledged that she often has trouble maintaining her glucose levels and, as a result, has been admitted to the hospital on several occasions to treat these symptoms as related to her diabetes.

At the close of testimony, Appellant moved for involuntary dismissal, arguing that the Appellees failed to meet their burden of proving medical causation to establish a causal connection between the ingestion of the chicken and their subsequent symptoms. The trial court denied the motion and requested that the parties submit post trial briefs concerning the law as

applied in food poisoning cases. On April 4, 2021, the trial court rendered judgment in favor of the Appellees, finding a causal connection between the consumption of the food and the Appellees' subsequent illnesses. The trial court awarded $2,500 for each of the four adult Appellees and awarded $2,000 to the minor Appellee, Jacob Pratt.

This appeal followed.

## DISCUSSION

In its sole assignment of error, Appellant contends that the trial court erred in finding that a causal connection existed between the Appellees' consumption of the chicken and their subsequent gastrointestinal symptoms because the Appellees failed to submit sufficient, credible evidence to satisfy their burden of proof. We agree.

Courts have held that to establish liability for the consumption of deleterious food, the plaintiff must prove that the product was in a deleterious condition when purchased. *Hairston v. Burger King Corp.*, 33,587 (La. App. 2 Cir. 6/21/00), 764 So. 2d 176. The plaintiff must further prove the existence of a causal relationship between the illness or injury and the consumption of the food. *Id.*; *Landry v. Joey's, Inc.*, 18-441 (La. App. 3 Cir. 12/12/18), 261 So. 3d 112, writ denied, 19-0072 (La. 3/6/19), 266 So. 3d 903. A trial court's factual findings are accorded great weight and may not be disturbed by a reviewing court in the absence of manifest error. *Id.* In fulfilling this burden, "it is not necessary for the consumer to negate every conceivable cause but he must show that it is more likely than not that the food's condition caused the injury of which he complains." *Landry, supra; Griffin v. Schwegmann Bros. Giant Supermarkets, Inc.*, 542 So. 2d 710 (La. App. 4 Cir. 1989).

6

Our courts have generally found that, in part, plaintiffs must have an official diagnosis of food poisoning in order to recover damages. Here, Appellees submitted a copy of their medical records from University Conway, which provided that they were diagnosed with food poisoning. Specifically, the medical reports reflected that the Appellees' visit diagnosis was food poisoning, with a final diagnosis of "toxic effect of other specified noxious substances eaten as food, accidental." Although the medical evidence submitted provides that the Appellees were diagnosed with food poisoning, we highlight, however, that no tests were performed during the Appellees' emergency room visit to confirm this diagnosis or confirm the presence of any bacterial infection, virus, parasite, or any other pathogen which could be linked to food poisoning.

Based solely upon the medical documentation provided in the record, it appears that the ER physician diagnosed the Appellees with food poisoning exclusively upon the information and symptoms Appellees complained of, without any subsequent testing. Assuming, *arguendo*, that the ER physician's conclusory diagnosis was sufficient to satisfy part of the Appellees' burden of proof, we find that there is still insufficient evidence establishing that the cause of the Appellees' illness was the chicken they consumed.

First, regarding the condition of the allegedly tainted chicken, we note that, absent the Appellees' testimony and their medical records indicating that they believed the chicken was the cause of their illness, there is no other evidence attesting to the deleterious or unwholesome condition of the chicken. Although the Appellees testified that they took pictures of the food, the pictures were never produced during trial and the record is absent

of any such photographs.  Moreover, Margaret Turner testified that after she attempted to return the chicken to the Appellant's restaurant, an incident report was filed; however, the result of that investigation, as stated by Liddell, has not been produced, nor was a copy of the claim submitted into evidence.  Further, no employee from the Appellant's restaurant, who either worked on the night Margaret Turner purchased the chicken or the day she returned the chicken, was called to testify as to the condition of the chicken.

Next, with respect to the Appellees' assertion that they established a causal link between their consumption of the chicken and their subsequent illness, we find that absent testimony, evidence, or opinion from a medical expert or healthcare provider regarding the condition of the chicken and the probability that its ingestion caused the illness, the Appellees failed to meet their evidentiary burden.  Several courts, including the Third and Fifth Circuits in *Landry*, *supra*, and *Landreneau v. Copeland's Cheese Cake Bistro LLC*, 08-647 (La. App. 5 Cir. 1/13/09), 7 So. 3d 703, respectively, have upheld the general rule that:

> . . . courts have never compelled a plaintiff to produce an actual analysis of the food consumed in order to establish its unwholesome condition.  Rather, the courts have been willing to infer the deleterious nature of the food consumed from the circumstances surrounding the illness.  In all of the cases in which there has been successful recovery, the plaintiff has shown that the food was consumed by him, and that ***no other food which might reasonably be assumed to have caused the illness had been consumed within a number of hours before or after the consumption of the suspect product.  The plaintiff has also had medical opinion to the effect that it was probable that his illness was caused by the consumption of the particular product involved.***  In addition, the successful plaintiffs in the above cases have been able to show some other independent circumstance, which tends to prove his case. . . (Emphasis added).

Accordingly, a plaintiff cannot establish that a food product caused an illness simply by presenting circumstantial evidence.

Rather, plaintiffs must have medical evidence to prove that they suffered food poisoning, *Landreneau*, *supra*, and medical evidence to prove that the food poisoning was caused by the consumption or ingestion of the allegedly tainted food. *Fuggins v. Burger King Corp.*, 33,473 (La. App. 2 Cir. 5/10/00), 760 So. 2d 605. There must be evidence that a particular food, or at least some item among a reasonably small group of foods, was unwholesome. A mere showing that a person became sick subsequent to eating food is insufficient.[2] Appellees argue that the chicken was the sole cause of their illness because it was the only meal they ate in common and the chicken was allegedly undercooked.

Courts have found that evidence attesting to the incubation period of bacteria and other food-borne illnesses may be used as an evidentiary means to determine whether the allegedly tainted or unwholesome food product was the cause of a plaintiff's illness.[3] Likewise, medical or expert testimony regarding the presence of such pathogens in the plaintiff or the food consumed, indicating the probability that the food consumed likely caused the illness, may also establish the plaintiff's case. *Griffin*, *supra*; *Hairston*, *supra*; *Fuggins*, *supra*. In this case, however, there is no medical or expert

---

[2] David Polin, Proof of Liability for Food Poisoning, 47 AM. JUR. PROOF OF FACTS 3d 47 §18 (1998).

[3] In *Hairston, supra*, the plaintiff's physician testified that "the incubation for different types of bacteria which can cause food poisoning is anywhere from an hour to a week." Likewise, in *Greenup v. Roosevelt*, 18-0892 (La. App. 4 Cir. 3/20/19), 267 So. 3d 138, the Fourth Circuit found that the plaintiff failed to establish that the specific food from the defendant restaurant caused her illness. The court stated that the plaintiff failed to prove the source of her illness, based in part on the physician's testimony that it usually takes at least six hours for food poisoning symptoms to manifest and that a few days before the plaintiff consumed the allegedly tainted food, she ate two different kinds of poultry.

testimony to support the conclusion that the Appellees' ingestion of the chicken caused their injuries.

The only evidence submitted in this case is the testimony of the Appellees and their medical records that indicate a diagnosis of food poisoning without subsequent testing of either the Appellees or the chicken. Although the Appellees testified that they believed the chicken caused their illness because they ate the food together and became sick around the same time, the testimony in this case also revealed that there were several other plausible factors that could have caused the Appellees' illness. For example, on cross-examination, Margaret Turner testified that she regularly has milk and cereal for breakfast and that on the day in question, she had this same meal prior to eating the chicken.

Further, DeWayne McKinley testified that he ate poultry or fish either the same day, a few days before, or within the same week that he consumed the chicken. Moreover, his medical records indicate that he did not begin to suffer from any symptoms until an hour before he presented to the emergency room, the day after he ate the chicken. Sherriff Turner also confirmed that as a Hepatitis C patient, he often suffers from abdominal pain, nausea, diarrhea, and other related symptoms. He also testified that he did not eat anything the day before Margaret purchased the chicken because his "stomach was messed up." Finally, Sherron Turner testified that the only thing she ate the week before consuming the chicken, was a turkey sandwich. She also confirmed on cross-examination that she is a diabetic and that when not properly treated, can cause symptoms similar to that of food poisoning.

Given that there are several other possibilities that could have plausibly caused the Appellees' food poisoning, and a lack of evidence confirming a probability that the chicken, rather than any other product consumed, caused the Appellees' illness, we cannot say that the Appellees met their burden of proof. Beyond a conclusory medical diagnosis of food poisoning, there is no evidence to support the conclusion that the Appellees' ingestion of the chicken caused their injuries. The cause of the Appellees' food poisoning could have reasonably been anything they ate from the day of or the week of consuming the chicken. Additionally, Liddell confirmed that there was no evidence of any other reported cases of food poisoning from customers within that time period.

It is not enough to conclude that illness, after the consumption of a food product, alone, is sufficient to establish a causal link for recovery. Finding that the Appellees failed to prove a causal relationship between their food poisoning and eating the chicken, we reverse the trial court's judgment.

## CONCLUSION

For the aforementioned reasons, we reverse the trial court's judgment. Costs of this appeal are cast on the Appellees.

**REVERSED.**